This case is number 19-1252, In Re Noble Systems Corporation, Mr. Costa. Thank you. To please the court, I'd like to provide a brief background. Contact centers employ call handlers to route calls to agents. They also employ e-learning systems to provide training to agents. And finally, they also employ workforce management systems to schedule the work shifts of agents. The workforce management systems typically are not involved in coordinating the other components, but this specification describes how the workforce manager system, the WFM, can be adapted to coordinate those other components to provide training to agents. Specifically, the claims recite a limitation, the beginning of training limitation, or beginning of training indicator that's sent from the WFM to the call handler at the beginning of training that causes the call handler to cease routing calls to the agents. Similarly, the WFM sends a beginning of training indicator to the e-learning system, causing it to provide training. Much of the dispute centers around this beginning of training indicator and how it impacts the patent eligibility and obviousness determination. Patent eligibility, as you know, involves two steps. The first is determining whether the claims are directed to an abstract idea, and if so, is there an inventive concept recited in the limitations? The second test is satisfied when the claim limitations involve more than the performance of well-understood and routine conventional activities in the industry. Noble Systems disputes what the PTO alleges the claims are directed to. The PTO states they're directed to scheduling and providing training to call center agents. That's rather broad because it's well-known that classroom training can be scheduled for agents. Agents can be scheduled time to review call recordings of exemplary recordings. Supervisors can be scheduled to sit down with an agent and coach them in real time how to handle a call. Noble does not purport to have invented this. What we have invented is a particular way of using the WFM, adapting it to coordinate these other components to provide a specific form of training. Consequently, Noble alleges the PTO's characterization is at too high level of abstraction, and it's untethered from the claim image because it does not consider the beginning of training indicator limitations, how they're sent, and how they're processed. A test used by this court in SAP America involved determining whether the claims had the specificity to transform a claim from one claiming only a result to one claiming a way of achieving it. Arguably, the beginning of training indication limitations recite a way of achieving it. Hence, Noble Systems alleges that the PTO's determination at step one should be set aside. Even if we accept that as correct and accurate, at step two, Noble alleges the beginning of training indicator limitations recite an inventive concept. The PTO's analysis is flawed because it sweeps away all consideration of these limitations by stating, the beginning of training indication limitations are merely part of the overall abstract idea of providing training and scheduling, which is a method of organizing human activity. The board correctly considered the beginning of training indicator limitation in its step one analysis, and on the last page, states that those limitations should not be considered at step two. So this approach is going to guarantee an incorrect finding of patent eligibility. First, we come up with a broad characterization of what the invention is directed to, disregarding the role of the WFM and how it sends the beginning of training indication. Next, at step two, we ignore the beginning of training indicator saying, oh, those were considered at step one. Of course, claims will be found patent eligible. But the PTO has not followed this court's mandate that at step two, we consider the elements of each claim both individually and as an ordered combination to determine whether additional elements transform the nature of the claim into a patent eligible application. The PTO makes another error in its step two analysis. By stripping out the processes, the operations that are the inventive concept from the processing systems, of course, what you will be left with are generic components. Recall that in the analysis is what the processes, the functions, the steps are performed. So if you strip those out and just focus on the computer as a result, of course, it will be generic. That leads us to the issue of obviousness. The PTO alleges that Kornblit, the prior art reference, renders obvious these beginning of training indicators. Consider the case of the WFM sending the indicator at the beginning of training time to the call handler, causing it to cease routing calls. The PTO alleges one skill in the art would find this obvious over Kornblit because Kornblit teaches that the call router ceases routing incoming calls to agents undertaking training as they are not available to take incoming calls. There are three problems with this reasoning. First, Kornblit discloses agents can receive emails before and after calls, and the emails can convey training. So therefore, the agents can simultaneously engage in training and call handling. There's no suggestion that the call router would have to stop routing calls. Second, even if it's true that the call router is a call handler, does not route calls to the agents while they're training. That by itself in no way suggests or teaches it's due to a WFM sending a beginning of training indicator to the call router. That is, there's no evidence, let alone substantial evidence. Finally, the PTO misinterprets the plain meaning of the words of Kornblit as to what it means to not route a call to an unavailable agent. It's well known in the contact center industry that agents speak to one person at a time. When they are on a call, they're unavailable. When the call ends, they're available. The call router routes calls to available agents, meaning they can handle a call. That's what it means. Alternatively, the PTO attempts to leverage KSR as the basis for modifying the WFM call handler and e-learning system in Kornblit. Well, it doesn't make sense to include this new functionality in the elements using KSR based on it simply arranges old elements with each performing the same function it had been known to perform because the prior art didn't show that these old elements performed the function. And besides, that's really a bootstrap logic. To argue that we would incorporate new functionality into these old elements that already perform it doesn't make sense. Nor does Kornblit show that the WFM sends this indicator to the e-learning system. The PTO relies on figure six for teaching that. Figure six shows information going in the other direction. To overcome this problem, the PTO makes two arguments. It relies on figure three. Figure three shows a central administration module. And if you read the text, it says that's for an agent to log in and communicate with these other components. It says nothing about these other components using that module to communicate among themselves. Finally, the board makes another argument. And this argument actually helps the whole system's position. The board says a skilled artisan would have understood that in order for the lesson presentation module to deliver the lesson to the agent at the scheduled time, scheduler 350, that's the WFM, would have to communicate the schedule, including the beginning of training time. The PTO is saying one skilled in the art would know it would have to communicate the schedule and the time. That's not what the limitations recite. The limitations recite sending an indicator at the beginning of training time. Sending a schedule with the time is distinct from sending an indicator at the start time. So in summary, the PTO has not shown by substantial evidence that Kornblit renders these limitations obvious. It doesn't disclose or suggest the WFM sending this to either the call handler or to the e-learning system. Certainly, the PTO has not shown that the WFM sending this indicator was well-known, conventional, or routine. So the PTO has not met its burden with showing that the claims are patent ineligible. With that, I'll take any questions. OK, thank you. Mr. McBride. Good morning. May it please the court. I'd like to point out that there's two grounds of rejection here, the obviousness rejection of your Kornblit and the patent eligibility rejection. Either one of those rejections are sufficient to affirm the board's decision. Starting with the 103. Are you aware of anything out there, either another pending application or an issued patent that is related to this that would be implicated by our decision here? I'm not. I believe we've mentioned that in our brief, and I'm not aware of any other pending applications that would be implicated. Returning to the obviousness rejection in view of Kornblit. Why don't you instead just start with 101? Start with 101? Sure, happy to do that. So I think it's a pretty straightforward Alice two-step analysis under step one. The board found that the claims were directed to scheduling and presenting training to call center agents. I just don't see how there's any difference in these claims between the two. It's a method of organizing human activity using a computer. Everything could be done. If the workforce manager wasn't the computer but was instead a person, couldn't he just walk from office to office to agent to agent with a hard copy of a calendar and schedule his training? And when the training starts, he could answer their calls for him? Yes, exactly. That's a very good point. Bam. Exactly done by a human. Everything in this claim done exactly by a human. This just uses the computer as a tool to do something a single human being could have done. Exactly what the Supreme Court's told us many times over, we can't do. Exactly. That's the 101 analysis in a nutshell. Do you have anything else that you think we need to know? I don't believe so. If there's no further questions on the 101 analysis or the obvious misrejection, I'm happy to yield the rest of my time. OK. Thank you. Thank you. Mr. Foster? Anything more? Thank you, Your Honor. On the point of whether there is an issued patent, there is a parent patent that has issued from the same specification. That patent was issued based on the beginning of training indicators. It was on- Are you asserting it anywhere in litigation? No. Ironically, the same Korenblit reference was cited, but it was cited as a secondary reference. Hence, I didn't bring that up in the appeal brief because it was a secondary reference. Now, it's a primary reference in this case. But it was allowed and issued as a patent. Regarding the method of doing schedule by manual, yes. Scheduling is done manually today. Some of the problems that occur is that the call handler can be routing calls to the agents when they're not supposed to be. And so using the WFM in a manner that has not been configured to do before solves one of the problems of coordinating these components so that we're not delivering training to an agent when we're not supposed to be. There are other two points I'd like to mention regarding the PTO's argument as to why one skilled in the art would have modified Korenblit. Regarding the WFM sending the indicator to the call handler, the PTO argues in its brief on page 23 that Korenblit teaches the business purpose of a contact center is to provide rapid and efficient interaction between agents and customers. It's well known that if you want to have rapid call acceptance, you increase the number of agents. If you decrease the number of agents, the call acceptance time goes up. So one skilled in the art would use that logic to not make an agent receiving training unavailable. They would not apply the teachings of the recited limitations of making that agent unavailable. So that actually cuts against the PTO's argument. The other point that I would like to mention is that PTO cites Korenblit paragraph 57 as encouraging one skilled in the art to modify it to send the indicator to an e-learning module. So that sentence says Korenblit teaches the components depicted in figure 3 cooperate to implement the integrated contact center business process. What the PTO doesn't fully cite is the full sentence, which says it's implementing the business process 200 as described earlier. Business process 200 is figure 2. Doesn't talk about training at all. Doesn't talk about how the WFM interacts. All right. Thank you, Mr. Costa.